# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| |
|---|
| **CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON**, |
| Plaintiff, |
| v. |
| **FEDERAL ELECTION COMMISSION**, |
| Defendant. |

Case No. 22-cv-3281 (CRC)

## MEMORANDUM OPINION AND ORDER

The eleven-year history of this case encapsulates the bureaucratic morass that has become the Federal Election Commission ("FEC" or "Commission"). In 2012, Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") filed an administrative complaint with the Commission, alleging that Intervenor American Action Network's ("AAN") expenditures on political advertisements during the 2010 midterm election cycle rendered it an unregistered political committee. In 2014, the FEC dismissed CREW's complaint. CREW petitioned this Court for review. And this Court remanded. In 2016, the FEC dismissed CREW's complaint again on remand. CREW again petitioned this Court for review. And, in 2018, this Court again remanded. After the FEC failed to act on the remand, CREW sued AAN directly, as it was permitted to do under the Federal Election Campaign Act ("FECA"). But because the FEC's initial decision dismissing CREW's administrative complaint invoked, in passing, the Commission's prosecutorial discretion, this Court held in 2022 that CREW's latest complaint against AAN must be dismissed.

Meanwhile, following the second remand in 2018, CREW's administrative complaint sat dormant before the agency for four years. Finally, in August 2022, the FEC voted for a third

time to close the file and issued a letter to CREW informing it of its right to petition this Court

for review once more.  CREW did so, and the FEC and AAN have now move to dismiss

CREW's latest petition.  The Court will deny the motions.

First, because CREW's complaint alleges a cognizable informational injury, the Court

rejects AAN's argument that CREW lacks standing to sue.  Next, the Court concludes that

CREW brought this action within 60 days of the FEC's dismissal of its administrative complaint.

Although the FEC deadlocked on a vote to initiate enforcement proceedings against AAN years

ago, the Court holds that the Commission did not "dismiss" CREW's complaint under the statute

until it closed the casefile last fall.  Next, the Court rejects the FEC's contention that any remand

here would be futile.  Finally, at least for now, the Court defers consideration of AAN's

argument that the FEC's invocation of its prosecutorial discretion to dismiss CREW's complaint

in 2014 renders non-reviewable the FEC's current dismissal, which disclaims any reliance on

prosecutorial discretion.  Because the D.C. Circuit may address that question in its review of

CREW's appeal of this Court's dismissal of its citizen suit against AAN, the Court will stay this

case pending the outcome of that appeal.

## I.    Background

The extensive history of this case has already been recounted in four prior opinions.  See

CREW v. FEC ("CREW I"), 209 F. Supp. 3d 77 (D.D.C. 2016); CREW v. FEC ("CREW II"),

299 F. Supp. 3d 83 (D.D.C. 2018); CREW v. AAN ("CREW III"), 410 F. Supp. 3d 1 (D.D.C.

2019); CREW v. AAN ("CREW IV"), 590 F. Supp. 3d 164 (D.D.C. 2022).  The Court provides

only a limited summary of the relevant background here.

In 2012, CREW, a non-profit government watchdog organization, filed an administrative

complaint with the FEC concerning AAN, a 501(c)(4) organization which spent millions of

dollars on political advertising in the lead-up to the 2010 midterms.  Compl. ¶¶ 30, 40–41.  In particular, CREW's complaint alleged that the content of AAN-sponsored ads run in the 2010 midterms showed that the organization's "major purpose" was federal campaign activity, a finding that would require AAN to register as a political committee under the FECA.  Id. ¶¶ 40–41.  Two years later, over the advice of its General Counsel, the FEC deadlocked 3-3 on whether to investigate CREW's complaint and voted 6-0 to close the file.  CREW I, 209 F. Supp. 3d at 83.  In the Statement of Reasons explaining the decision not to proceed with an investigation, the so-called "controlling Commissioners"—those whose votes prevented a finding of reason to believe a violation had occurred—stated, among other things, that "constitutional doubts raised [t]here militate[d] in favor of cautious exercise of [their] prosecutorial discretion."  In re AAN, Statement of Reasons of Chairman Lee E. Goodman and Commissioners Caroline C. Hunter and Matthew S. Petersen ("First Statement of Reasons") at 23–24 n.137, MUR No. 6589 (July 30, 2014);[1] see CREW v. FEC (CHGO), 892 F.3d 434, 437–38 (D.C. Cir. 2018) (explaining that, "for purposes of judicial review," the statement of reasons from controlling Commissioners is "treated as if they were expressing the Commission's rationale for dismissal").

Displeased with this result, CREW filed a complaint in this Court challenging the FEC's dismissal as contrary to law.  See 52 U.S.C. § 30109(a)(8)(A), (C) (providing right to sue for party aggrieved by order of the FEC dismissing a complaint).  This Court granted summary judgment to CREW, finding the FEC's substantive analysis contrary to law, and remanded the matter to the agency with instructions to conform to the Court's declaration.  See CREW I, 209 F. Supp. 3d at 92–93, 95.

---

[1]  Available at https://eqs.fec.gov/eqsdocsMUR/14044362004.pdf.

On remand, the FEC again deadlocked over the recommendation of its General Counsel, failing for a second time to find reason to believe that AAN violated FECA, and once more voted 5-1 to close the file.  Compl. ¶ 47.  The Statement of Reasons accompanying the FEC's second dismissal, while updating the FEC's analysis in light of this Court's opinion, also "incorporate[d] by reference" the "analysis and discussion" of its First Statement of Reasons "on all points except for aspects deemed contrary to law by the court."  In re AAN, Statement of Reasons of Chairman Lee E. Goodman and Commissioners Caroline C. Hunter and Matthew S. Petersen ("Second Statement of Reasons") at 2, MUR No. 6589R (Oct. 19, 2016).[2]  CREW again filed suit in this Court, and again, this Court granted summary judgment to CREW and remanded to the FEC to conform to its decision.  CREW II, 299 F. Supp. 3d at 95.

This time, however, the FEC took no action within 30 days of remand.  Compl. ¶ 52.  Accordingly, CREW filed suit against AAN directly, as it is permitted to do under 52 U.S.C. § 30109(a)(8)(C).  AAN filed a motion to dismiss arguing, as relevant here, that the FEC's fleeting invocation of prosecutorial discretion in its First Statement of Reasons (which was incorporated by reference into the FEC's Second Statement of Reasons) rendered the FEC's dismissal of CREW's administrative complaint unreviewable under the D.C. Circuit's then recent decision in CHGO, 892 F.3d at 437–38.  This Court rejected that argument, holding that "[n]othing in CHGO suggests that the mere invocation of the phrase 'prosecutorial discretion' precludes judicial review" and that what precludes review is instead "reliance by the FEC on factors particularly within its expertise in exercising that discretion."  CREW III, 410 F. Supp. 3d at 16.  The Court therefore denied the motion to dismiss.

---

[2]  Available at https://www.fec.gov/files/legal/murs/6589/16044401031.pdf.

While discovery was ongoing in that case, the D.C. Circuit issued a new decision elaborating on CHGO's analysis of when the FEC's invocation of prosecutorial discretion bars judicial review.  Specifically, in CREW v. FEC (New Models), 993 F.3d 880 (D.C. Cir. 2021), the Circuit held that "a Commission decision that rests even in part on prosecutorial discretion cannot be subject to judicial review."  Id. at 884.  In light of that intervening precedent, AAN filed a motion for reconsideration, again asking the Court to dismiss CREW's action as unreviewable.  CREW IV, 590 F. Supp. 3d at 165–66.  The Court observed the similarities between CREW's suit against AAN and New Models, including that the FEC's stalemate in the AAN case "resulted in the dismissal of CREW's administrative complaint," that the "controlling FEC Commissioners issued a lengthy Statement of Reasons that applied a 'thoroughgoing legal analysis' to support the dismissal," and that the Statement of Reasons included "only a fleeting, conclusory reference to prosecutorial discretion."  Id. at 173 (quoting New Models, 993 F.3d at 896 (Millett, J., dissenting)).  In light of those "parallel circumstances," the Court concluded that New Models rendered the FEC's dismissal of CREW's administrative complaint unreviewable. Id. at 174–75.  The Court acknowledged that, unlike in New Models, the controlling Commissioners in CREW's action against AAN "issued two separate Statements of Reasons, one after a remand from this Court, and the second statement did not mention prosecutorial discretion at all."  Id. at 174 n.7.  Those distinctions, however, were immaterial, as under New Models, the Court "lacked the power to issue the remand order that resulted in the second statement" and, "[i]n any event, the second Statement of Reasons 'incorporate[d] by reference' the first one 'on all points except for aspects deemed contrary to law' by this Court."  Id. (second alteration in original).  Accordingly, the Court dismissed CREW's suit against AAN.  Id. at 175.

But just when the Court thought it was out of the fray, CREW and the FEC have pulled it back in.  As it turned out, about a month after CREW filed its citizen suit against AAN, on May 10, 2018, the FEC took a third reason-to-believe vote on CREW's administrative complaint, which failed by a vote of 3-0, with Commissioner Ellen Weintraub (the sole Democratic appointed member at the time, due to appointment delays) voting to abstain.  See Compl., Ex. 5, In re AAN, Statement of Reasons of Commissioner Ellen L. Weintraub ("Third Statement of Reasons") at 4, MUR No. 6589R (Sept. 30, 2022).[3]  Ordinarily, after a failed reason-to-believe vote, the FEC immediately follows up with a vote to close the file on the administrative complaint.  See, e.g., In re AAN, Certification, MUR No. 6589R (Oct. 19, 2016).[4]  But here, the Commission's subsequent vote to close the file likewise failed by a vote of 3-1.  In re AAN, Certification, MUR No. 6589R (May 14, 2018) ("May 2018 Certification").[5]  Because votes are only published after the FEC has "closed" a matter, the parties were not informed of the Commission's failed reason-to believe vote taken in May 2018.  See 11 C.F.R. §§ 111.20–111.21 (providing that Commission's findings shall not be made public until the Commission "makes a finding of no reason to believe or no probable cause to believe or otherwise terminates its proceedings"); id. § 5.4(a)(4) (documents "shall be placed on the public record of the Agency no later than 30 days from the date on which all respondents are notified that the Commission has voted to close such an enforcement file.").  Instead, a week after the failed May 2018 reason-to-believe and file-closure votes, the FEC sent the parties a letter stating that, pursuant to this Court's remand, "the underlying enforcement matter, MUR 6589R, is currently open before the

---

[3]  Available at https://www.fec.gov/files/legal/murs/6589R/6589R_31.pdf.

[4]  Available at https://www.fec.gov/files/legal/murs/6589R/6589R_17.pdf.

[5]  Available at https://eqs.fec.gov/eqsdocsMUR/6589R_22.pdf.

Commission" and explaining that the Commission "will notify you immediately regarding any determination the Commission makes with regard to" the case.  In re AAN, Notification to American Action Network, MUR No. 6589R (May 17, 2018).[6]

Then, for nearly four years, CREW's administrative complaint sat in FEC purgatory.  The now-public administrative record shows that the FEC took another vote to close the case file in January 2022, but that vote deadlocked 3-3.  In re AAN, Certification, MUR No. 6589R (Jan. 11, 2022).[7]  Finally, on August 29, 2022, the Commission voted 5-1 to close the file.  In re AAN, Certification, MUR No. 6589R (Aug. 29, 2022).[8]  A few days later, the FEC sent CREW and AAN a letter informing them that on "May 10, 2018, the Commission considered the matter, and there was an insufficient number of votes to find reason to believe that American Action Network violated" FECA and that the Commission had now (four years later) "closed its file in this matter."  In re AAN, Notification to CREW at 1, MUR No. 6589R (Sept. 1, 2022).[9]  The letter attached a Statement of Reasons by the three Republican-appointed Commissioners, which was authored in May 2022, expressing remorse at the Commission's failure, to that point, to close the file in the case.  Id. at 3–8.  Additionally, the letter informed CREW that FECA "allows a complainant to seek judicial review of the Commission's dismissal of this action," citing 52 U.S.C. § 30109(a)(8).  Id. at 2.  About thirty days later, the FEC published its record of the AAN proceedings.  Compl. ¶ 54.

---

[6] Available at https://www.fec.gov/files/legal/murs/6589R/6589R_24.pdf.

[7] Available at https://www.fec.gov/files/legal/murs/6589R/6589R_26.pdf.

[8] Available at https://www.fec.gov/files/legal/murs/6589R/6589R_27.pdf.

[9] Available at https://www.fec.gov/files/legal/murs/6589R/6589R_28.pdf.

A final twist:  About a month after the FEC finally voted to close the AAN administrative

file and notified the parties of that decision, Commissioner Weintraub, whose abstention in 2018

prevented the FEC from obtaining four votes to find reason to believe a violation had occurred,

issued a Statement of Reasons explaining the basis for her vote.  See generally Third Statement

of Reasons.  Because Commissioner Weintraub's abstention caused the FEC to "fail[] to muster

four votes in favor of initiating an enforcement proceeding," her statement, as the FEC concedes

here, is treated as "expressing the Commission's rationale for dismissal."  CHGO, 892 F.3d at

437.  But contrary to the norm that "those explaining a dismissal's rationale agree with the

outcome and explain all the ways the dismissal was not contrary to law," Commissioner

Weintraub's statement did the opposite, instead explaining "why dismissing the complaint in this

matter was *absolutely* contrary to law."  Third Statement of Reasons at 8.  And apparently

seeking to ensure that the FEC could not insulate its dismissal of CREW's administrative matter

from judicial review, Commissioner Weintraub's statement explicitly disclaimed "in its entirety

the reasoning contained in" the prior Statements of Reasons in this case, declared that the FEC

"did *not* dismiss this matter pursuant to prosecutorial discretion," and added that the Commission

"did *not* dismiss this matter because the statute of limitations had elapsed."  Id. at 8–9 (emphasis

in original).  Commissioner Weintraub concluded that "the dismissal of this matter was

unreasonable, given the facts before the Commission, the law governing this activity, and the

reasoning referenced" in the statement, and therefore the dismissal was contrary to law.  Id. at

11.

Armed with Commissioner Weintraub's statement, CREW filed this new suit against the

FEC under 52 U.S.C. § 30109(a)(8) in October 2022, alleging that the Commission's most recent

dismissal of their administrative complaint was, as Commissioner Weintraub's controlling

statement maintains, contrary to law.  Compl. ¶¶ 61–65.  The Court granted AAN's motion for leave to intervene in the case.  Both the FEC and AAN filed motions to dismiss, raising distinct arguments for dismissal.  The motions to dismiss are now ripe for the Court's consideration.

## II.   Legal Standards

When evaluating a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), the Court must "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting plaintiff[s] the benefit of all inferences that can be derived from the facts alleged.'"  Am. Nat'l Ins. Co. v. FDIC, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting Thomas v. Principi, 394 F.3d 970, 972 (D.C. Cir. 2005)).  The plaintiff bears "the burden of proving by a preponderance of the evidence that the Court has subject matter jurisdiction."  Biton v. Palestinian Interim Self-Gov't Auth., 310 F. Supp. 2d 172, 176 (D.D.C. 2004).  The Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction."  Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

Under Rule 12(b)(6), a motion to dismiss must be granted if the complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In deciding a 12(b)(6) motion, the Court "must accept as true all of the factual allegations contained in the complaint."  Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citing Twombly, 550 U.S. at 555–56).  Any ambiguities must be viewed in a light most favorable to the Plaintiff, giving it the benefit of every reasonable inference drawn from the facts and allegations in the complaint.  In re Interbank Funding Corp. Sec. Litig., 668 F. Supp. 2d 44, 47 (D.D.C. 2009) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

### III. Analysis

Altogether, the FEC and AAN move to dismiss CREW's claim on four grounds. While the FEC posits that any remand would be futile, AAN asserts that CREW lacks standing, that its suit is time-barred, and that the FEC's invocation of prosecutorial discretion in the First Statement of Reasons, as incorporated in the second, precludes any review. The Court will first address AAN's arguments regarding standing and the timeliness of CREW's complaint, both of which go to the Court's subject matter jurisdiction, before turning to the parties' remaining grounds for dismissal.

### A. Standing

To show the "irreducible constitutional minimum" of standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)). An injury in fact must be both "concrete and particularized." Id. at 339 (quoting Lujan, 504 U.S. at 560). AAN contends that CREW has not alleged injury in fact because it "has not plausibly pled 'that the alleged information deficit,'" stemming from AAN's failure to disclose certain information under FECA, has "'hindered' its activities," as an "asserted informational injury that causes no adverse effects cannot satisfy Article III." AAN Mot. Dismiss at 15 (quoting TransUnion v. Ramirez, 141 S. Ct. 2190, 2214 (2021)). This Court addressed and rejected a largely identical argument in its opinion denying AAN's initial motion to dismiss CREW's citizen suit. CREW III, 410 F. Supp. 3d at 12–14. The Court sees no basis to alter its previous conclusion.

As this Court explained in CREW III, the "Supreme Court has long recognized that FECA creates an informational right—the right to know who is spending money to influence elections, how much they are spending, and when they are spending it."  CREW III, 410 F. Supp. 3d at 12.  Deprivation of this right to information that should be disclosed under FECA, therefore, inflicts an injury in fact "when the plaintiff fails to obtain information which must be publicly disclosed pursuant to [the] statute."  Id. (quoting FEC v. Akins, 524 U.S. 11, 21 (1998)).  Moreover, as Akins explained, injury in fact exists where the information to which the plaintiff claims entitlement "would help them (*and others to whom they would communicate it*) to evaluate candidates for public office."  Id.  (quoting Akins, 524 U.S. at 21).  For that reason, courts in this district, including this one, have conferred standing to "groups who, like CREW, 'engage[] in a number of campaign-finance related activities—including public education, litigation, administrative proceedings, and legislative reform efforts—where the sought-after information would likely prove useful.'"  Id. at 13 (quoting Campaign Legal Ctr. v. FEC, 245 F. Supp. 3d 119, 127 (D.D.C. 2017)).

Just as the Court found "no reason to doubt" CREW's previous "claim that the information sought would help it in its activities," it comes to the same conclusion here.  Id. (quoting Friends of Animals v. Jewell, 824 F.3d 1033, 1040–41 (D.C. Cir. 2016)).  Similar to the allegations in CREW's citizen suit against AAN, CREW's present complaint pleads that the organization "uses a combination of research, litigation, and advocacy to advance its mission" of empowering voters and exposing corruption, that it "does this . . . by educating citizens regarding the integrity of the electoral process and our system of government," and that, "[t]oward this end, CREW monitors the campaign finance activities of those who run for federal and state office and those who support or oppose such candidates," relying on information to which it alleges it is

11

entitled under FECA.  Compl. ¶¶ 8–10.  Thus, "when an individual, candidate, political committee, or other regulated entity fails to disclose or provides false information in reports required by the FECA," CREW "is hindered in its programmatic activity," including its ability to publicize "those who violate federal campaign finance laws through its website, press releases, and other methods of distribution," which in turn serves "CREW's mission of keeping the public informed" about unethical or illegal campaign activities.  Id. ¶¶ 9–10; see CREW III, 410 F. Supp. 3d at 13 (finding standing where CREW pleaded "it regularly reviews disclosure reports required by FECA and uses the information they contain regarding campaign expenditures for a host of programmatic activities, such as 'look[ing] for correlations between . . . spending on independent campaign activity that . . . benefits a candidate, and that member's subsequent congressional activities'").

As the Court found previously, "[t]hat's all Akins and Jewell require."  Id. at 13.  Were there any doubt, the D.C. Circuit has, since CREW III, endorsed exactly this reasoning.  In Campaign Legal Ctr. & Democracy 21 v. FEC, 952 F.3d 352 (D.C. Cir. 2020), the Circuit held that two organizations committed to "supporting and enforcing campaign finance law" had informational standing to challenge the FEC's dismissal of their complaints.  Id. at 355–56.  Like CREW, the organizations alleged that they participated in "public education, litigation, regulatory practice, and legislative policy" and that the accurate disclosure of contributor information they sought "would further their efforts to defend and implement campaign finance reform."  Id. at 356 (citation omitted).  That is precisely CREW's goal here.  Contrary to AAN's characterization, CREW's alleged injury does not stem from a bare desire that others comply with the law but rather its own, individualized interest in carrying out its organizational goals of

educating the public about the integrity of the electoral process and conducting research, litigation, and advocacy to reduce government corruption.[10]

AAN appears to suggest that the Supreme Court's recent decision in TransUnion v. Ramirez somehow changed this landscape.  AAN Mot. Dismiss at 17.  It did not.  AAN points to TransUnion's statements—in a case not involving "a public-disclosure law" like FECA—that plaintiffs asserting an informational injury must identify "'downstream consequences' from failing to receive the required information" and must demonstrate "that the alleged information deficit hindered their ability to" engage in some activity.  141 S. Ct. at 2214.  Those statements, however, do not change but rather encapsulate the analysis this Court already employed—assessing whether CREW's failure to receive the requested disclosures would harm its ability to advance its organizational mission.  Accepting "as true all of the factual allegations contained in the complaint," Erickson, 551 U.S. at 94, CREW plausibly states an informational injury sufficient to confer standing.

B.  Timeliness

The Court next turns to AAN's contention that CREW's suit is time barred.  FECA provides that a party "aggrieved by an order of the Commission dismissing a complaint" may petition for review of that decision "within 60 days after the date of the dismissal."  52 U.S.C. § 30109(a)(8)(A), (B).  AAN contends that CREW has missed this 60-day window and that, as a result, the Court cannot consider the merits of its petition.  See AAN Mot. Dismiss at 17–22.  In

---

[10]  The Court is not persuaded by AAN's argument that the age of the information CREW seeks—AAN's donors for activities that took place over ten years ago—renders that information useless to CREW's mission.  AAN Mot. Dismiss at 16–17.  Even if the disclosures CREW seeks would be so limited, a point CREW disputes, Opp'n at 22, donor information from a decade ago could easily prove useful to CREW's efforts to report on public corruption, for instance, by exposing past political corruption or campaign finance violations by donors or political figures who are still active today.

making this argument, however, AAN does not identify when exactly the statute of limitations period ran.  It instead advances only a negative argument that the Commission's August 2022 vote to close the file could not have started the clock because this vote was simply a ministerial act, not a "dismissal" under § 30109(a)(8).  Id.  Thus, in AAN's telling, whenever the clock actually began to tick, the 60-day deadline had long passed by the time CREW filed the current action in October 2022.

The Court disagrees.  The August 2022 vote to close the file was indeed a dismissal that triggered the 60-day window, and thus CREW's petition was timely in the first place.  But even if the dismissal had occurred at some earlier point in time—namely, when the FEC deadlocked on the 2018 reason-to-believe vote—it is likely that equitable tolling would apply here.

### 1.   When was CREW's administrative complaint dismissed?

To address the merits of AAN's argument, the Court first must pinpoint when the FEC dismissed CREW's administrative complaint—and thereby triggered § 30109(a)(8)'s window—after the Court remanded the matter to the Commission in CREW II.  There are two possibilities: (1) the deadlocked reason-to-believe vote in May 2018; or (2) the successful vote to close the file in August 2022.  CREW's claim is time barred if it is the former, but it is timely if the latter was the relevant dismissal.  With two recent exceptions, which are discussed further below, the Court is unaware of any opinion squarely addressing this question.  The Court suspects that is because, until recently, the FEC's vote declining to pursue enforcement proceedings and its vote to close the case file have, almost always, occurred at the same time, the latter following logically from the former.  See, e.g., In re Am. Jewish Comm., Certification at 618, MUR No. 2163 (Jan. 10, 1991) (voting to take "no further action" as to the complaint and voting to "[c]lose the file in this

matter");[11] In re Duncan Hunter, Certification, MUR No. 5908 (June 30, 2010) (same).[12]  But that is no longer the case anymore, as this case demonstrates, forcing the Court to pick a start date here.  Having considered the relevant materials, the Court concludes that the Commission dismissed CREW's complaint for purposes of the application of the statute of limitations at the latter date when it voted to close the file in August 2022.

The Court begins with the statute itself, which provides only moderate assistance.  As stated above, § 30109(a)(8)(A)–(B) provides that any party "aggrieved by an order of the Commission dismissing a complaint filed by such party" may file a petition in this court "within 60 days after the date of the dismissal."  Although the statute does not define "dismissal," at least two textual clues suggest to the Court that the deadlocked reason-to-believe vote here, on its own, does not suffice.  First, other subsections of the statute refer to the Commission's decisions whether to proceed with enforcement actions or not.  Section 30109(a)(2) provides that if the Commission, by an "affirmative vote of 4 of its members" finds "reason to believe" a violation has occurred, then it should notify the respondent and make an investigation of the alleged violation.  Other sections similarly discuss what follows if the Commission finds "probable cause" to believe that a violation occurred.  52 U.S.C. § 30109(a)(4)(A)(i), (5)(C).  But when describing the event that triggers the 60-day clock for filing a petition, the statute refers neither to the "reason to believe" event nor the "probable cause" event, instead using the terms "dismissing" and "dismissal."  Id. § 30109(a)(8)(A)–(C).  This variation suggests at least that a "dismissal" is not the same thing as a failed reason-to-believe or probable-cause vote.  See Sw. Airlines Co. v. Saxon, 142 S. Ct. 1783, 1789 (2022) ("[W]here [a] document has used one term

---

[11] Available at https://perma.cc/92CJ-6UD2.

[12] Available at https://perma.cc/VZ5R-NWNU.

in one place, and a materially different term in another, the presumption is that the different term denotes a different idea." (alterations in original) (quoting Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 170 (2012))).

Second, § 30109(a)(8)(A) refers not to "dismissal" in the abstract but to a party "*aggrieved* by an *order* of the Commission dismissing a complaint." 52 U.S.C. § 30109(a)(8)(A) (emphasis added). An "order," in common parlance, is a "command, direction, or instruction" that "generally embraces final decrees" or "interlocutory directions or commands." Order, Black's Law Dictionary (11th ed. 2019). That is, an "order" typically is directed *to* someone or something. Likewise, a person "aggrieved" is one "having legal rights that are adversely affected." Aggrieved, Black's Law Dictionary (11th ed. 2019). When the FEC here deadlocked on its reason-to-believe vote in 2018, however, it is difficult to see how anything was "commanded" or anyone was "aggrieved." Neither CREW nor AAN was notified of the failed reason-to-believe vote; rather, both parties were simply sent letters informing them that "[p]ursuant to the court's remand, the underlying enforcement matter, MUR 6589R, is currently open before the Commission" and that the Commission "will notify you immediately regarding any determination the Commission makes." Notification to American Action Network, supra, at 1. Such a letter hardly strikes the Court as an order. Moreover, although the Commission filed a certification of the vote describing its outcome, that file was not made public until after the case was closed in 2022. Whether or not a tree that falls in an empty forest makes a sound, the Court struggles to see how CREW can be "aggrieved" by a vote that is never made known to it.

The Commission's regulations, policy statements, and practices bolster this conclusion. The FEC's Statement of Policy on Commission Action states that, "[a]s with other actions taken by the Commission, dismissal of a matter requires the vote of at least four Commissioners." 72

Fed. Reg. 12,545, 12,545–46 (Mar. 16, 2007).  Treating deadlocked reason-to-believe votes as dismissals obviously conflicts with this position, which the D.C. Circuit implicitly recognized in End Citizens United PAC v. FEC, 69 F.4th 916 (D.C. Cir. 2023).  After quoting from the Policy Statement for the proposition that four votes are needed to dismiss a complaint, the court noted that, "before the Commission's unanimous vote to 'close the file,' several other votes also failed to get the requisite four votes for the Commission to act, and there is no suggestion that those votes impart the Commission's reason for the dismissal."  Id. at 921.  This appears to distinguish between failed votes (including a deadlocked reason-to-believe vote) and successful votes for file closure, and it indicates that only the latter constitutes dismissal.  To be sure, this analysis is in tension with the D.C. Circuit's earlier decision in New Models, which rejected the plaintiff's argument that four votes are required to dismiss a complaint because dismissal does not appear in 52 U.S.C. § 30107(a)(6)'s enumerated list of actions that require four votes, suggesting that it is governed by the "general rule that the Commission must make decisions by majority vote."  993 F.3d at 891.  But whether dismissal requires four votes or merely a bare majority, accepting deadlocks as dismissals would violate even the majority-vote rule because it would authorize dismissals when the Commissioners are evenly divided or even when, as in the third reason-to-believe vote here, three of the Commissioners vote in favor and none vote against finding probable cause.

Another subsection of the FECA, § 30109(a)(4)(B)(ii), sets forth the conditions under which the Commission may make public its actions and determinations, stating that if "the Commission makes a determination that a person has not violated this Act[,] . . . the Commission shall make public such determination."  The Commission promulgated 11 C.F.R. §§ 111.20, 111.21, and 5.4(a)(4) to implement this provision.  See AFL-CIO v. FEC, 333 F.3d 168, 171

(D.C. Cir. 2003).  Section 111.20, as relevant here, provides that if "the Commission makes a finding of no reason to believe or no probable cause to believe or otherwise terminates its proceedings, it shall make public such action and the basis therefor no later than thirty (30) days from the date on which the required notifications are sent to complainant and respondent."  11 C.F.R. § 111.20(a).  Until then, the investigation file remains confidential.  Id. § 111.21(a).  The other provision, 11 C.F.R. § 5.4, which harmonizes these confidentiality rules with the Freedom of Information Act, AFL-CIO, 333 F.3d at 171, provides that various investigatory materials, including "[o]pinions of Commissioners rendered in enforcement cases," should be placed on the public record of the Commission no later than 30 days from the date that the Commission notifies the parties it "has voted to close" the enforcement file, 11 C.F.R. § 5.4(a)(4).  Putting all this together, the regulations equate the statutory "determination that a person has not violated this Act," 52 U.S.C. § 30109(a)(4)(B)(ii), with the moment that the commission "terminates its proceedings," an event which typically (at least in the past) coincides with a finding of no reason to believe or no probable cause, 11 C.F.R. § 111.20(a).

Here, however, the Commission clearly had not "terminate[d] its proceedings" as to CREW's administrative complaint as of May 2018.  It took two more votes on the matter in January and August 2022, and the complaint continued to sit on its docket.  And, as far as the Court can tell, nothing would have stopped the Commission from reconsidering its deadlocked 2018 reason-to-believe vote before it finally closed the file later in 2022.  Matter of fact, the Court is aware of another FEC case on its own docket where precisely that happened—with the Commission taking two identical reason-to-believe votes a week apart before the file was closed in a subsequent vote.  See In re John Ellis Bush, Certification, MUR Nos. 6915 & 6927 (Dec. 7,

2018);[13] <u>In re John Ellis Bush</u>, Certification, MUR Nos. 6915 & 6927 (Dec. 14, 2018).[14]  The

Court's docket is far from unique, as this appears to be a standard practice for the Commission

these days.  <u>See, e.g.</u>, <u>Heritage Action for Am. v. FEC</u>, No. 22-cv-1422 (CJN), 2023 WL

4560875, at *3 (D.D.C. July 17, 2023) (describing the Commission's multiple reason-to-believe

votes over a period of several weeks).  This pattern demonstrates that the Commission does not

view a deadlocked reason-to-believe vote as a dismissal.

Indeed, the Commission has stated that position in explicit terms.  In <u>Heritage Action for</u>

<u>America</u>, the Commission refuted the plaintiff's "unsustainable premise" that a failed reason-to-

believe vote terminated proceedings before the agency.  <u>See</u> Opp'n Mot. Summ. J. at 23–31, No.

22-cv-01422, ECF No. 26.  It began by describing the agency's "long-standing practice of

terminating matters only through successful votes to close the file."  <u>Id.</u> at 24.  This practice

made sense, it explained, because "a 'deadlocked' vote that fails to reach a four Commissioner

majority is not a 'determination' under the FECA" and because reliance on an affirmative vote to

close the administrative file "allows the Commissioners to further consider a matter after a single

inconclusive vote.  In fact, the Commission has often held one reason-to-believe or probable-

cause-to-believe vote that does not pass, only to determine in a later vote that there was in fact

reason to believe or probable cause to believe on the same claim."  <u>Id.</u> at 24–25.  It then cited a

plethora of cases involving reversals after initial failed reason-to-believe votes, <u>id.</u> 27 & nn.4–6,

and detailed why this practice is perfectly consistent with the FECA and the relevant regulations,

<u>see id.</u> at 23–31.  This reasonable interpretation of the statutory and regulatory framework that

comports with the Commission's long-standing approach warrants some degree of deference.

---

[13] Available at https://www.fec.gov/files/legal/murs/6927/6927_15.pdf.

[14] Available at https://www.fec.gov/files/legal/murs/6927/6927_16.pdf.

See, e.g., Drake v. FAA, 291 F.3d 59, 69 (D.C. Cir. 2002) (noting courts should defer to agency interpretations of regulations presented in the course of litigation if consistent with past practice); Landmark Legal Found. v IRS, 267 F.3d 1132, 1136 (D.C. Cir. 2001) (granting Skidmore deference to an agency's interpretation of a statute advanced during litigation).

One additional fact here is more damning still to AAN's argument.  The statute requires that the Commission "shall make public" its "determination that a person has not violated" FECA.  52 U.S.C. § 30109(a)(4)(B)(ii).  But here, as already discussed, the only public disclosure following the Commission's deadlocked reason-to-believe vote was its May 17, 2018 letter stating that the matter remained open.  By contrast, after the FEC finally voted to close the file in August 2022, it informed the parties—for the first time—about the May 2018 vote that resulted in "an insufficient number of votes to find reason to believe."  Notification to CREW, supra, at 2.  Most striking, the letter also finally informed CREW that it was entitled "to seek judicial review *of the Commission's dismissal of this action*" pursuant to § 30109(a)(8).  Id. (emphasis added).  In other words, both the Commission's regulatory framework and its treatment of the events in this case support the conclusion that the file closure, not the reason-to-believe vote on its own, was the moment the case was "dismissed."

Turning to case law, both AAN and CREW point to statements in various opinions of this court and the D.C. Circuit which, in their view, prove the meaning of the words "dismissal."  As noted above, however, those cases uniformly involve instances where the Commission voted not to pursue enforcement and voted to close the file at the same moment.  The cases, therefore, are only minimally instructive.  But to the extent they point in any direction, they support CREW's understanding that a dismissal follows or results from—and is not one and the same as—a deadlocked reason-to-believe vote.  In describing the "deadlock dismissal" phenomenon,

Democratic Congressional Campaign Committee v. FEC (DCCC), 831 F.2d 1131 (D.C. Cir. 1987), framed the case as asking what happens when the FEC "deadlocks and for that reason dismisses a complaint." Id. at 1132; see also id. (describing "dismissal due to a deadlock"). The next year, in Common Cause v. FEC, 842 F.2d 436 (D.C. Cir. 1988), the D.C. Circuit again described deadlock dismissals in the following terms: "dismissal of a complaint resulting from a 3-3 deadlock vote," id. at 448, "dismiss[ing] the complaint for lack of the requisite four votes in favor of pursuing the investigation," id. at 449, requiring a statement of reasons "at the time when a deadlock vote results in an order of dismissal," id., and "orders of dismissal based on deadlock votes," id. at 451. And in FEC v. National Republican Senatorial Committee, 966 F.2d 1471 (D.C. Cir. 1992), the court again described its holding in DCCC as explaining what happens "when the Commission deadlocks 3-3 and so dismisses a complaint." Id. at 1476. In other words, although these cases did not hold one way or another on the issue before this Court, they all contemplated that the reason to believe deadlock and the dismissal itself were two separate events, the latter brought about by the former.

The Circuit's recent decision in End Citizens United PAC reaffirms this understanding when stating that, "[i]n the absence of four votes to proceeding, the Commission *may* dismiss the administrative complaint and close the file." 69 F.4th at 918 (emphasis added). "May" is not "must." Although oftentimes a deadlocked reason-to-believe vote will lead to a successful vote to close the file and dismissal of the complaint, that need not be the case. As the FEC's recent track record demonstrates, the Commission is free to keep the file open in the hopes of reaching some resolution on the matter. Thus, until the Commission affirmatively votes to close the file, the door remains open for further enforcement action because the complaint is not closed—*viz.*, the Commission has not dismissed the complaint.

Finally, background principles of claim accrual and administrative law compel the conclusion that the FEC's closure of the case file triggered the 60-day clock here.  General common law principles hold that "the standard rule" is that a claim accrues "when the plaintiff has 'a complete and present cause of action,'" that is, when "the plaintiff can file suit and obtain relief."  Wallace v. Kato, 549 U.S. 384, 388 (2007) (citation omitted); see also Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Calif., Inc., 522 U.S. 192, 201 (1997) ("Unless Congress has told us otherwise in the legislation at issue, a cause of action does not become 'complete and present' for limitations purposes until the plaintiff can file suit and obtain relief.").  Here, there is no way that CREW "could have filed" a petition challenging the Commission's dismissal of its administrative complaint within 60 days of the 2018 reason-to-believe vote because it did not, and it appears could not, have known about the deadlocked vote until after the Commission closed the case file.  Moreover, concluding that the deadlocked reason-to-believe vote, on its own, triggers § 30109(a)(8)'s 60-day clock would render "meaningful judicial review of the Commission's decision not to proceed" impossible in cases like this one.  Common Cause, 842 F.2d at 449.  Considered alongside the statute, regulations, and agency practice, the Court concludes that CREW's complaint here was timely filed.

Before the Court ends on the question of timeliness, it must acknowledge that two other courts in this district have recently come to conclusions that are either in some tension or direct conflict with this decision.  In Campaign Legal Center v. 45Committee, Inc., No. 22-cv-1115 (APM), 2023 WL 2825704 (D.D.C. Mar. 31, 2023), after the FEC failed to act on Campaign Legal Center's ("CLC") administrative complaint against 45Committee, the court found that the Commission's delay was contrary to law and ordered the Commission to conform within 30 days, pursuant to § 30109(a)(8)(C).  Id. at *2.  After the FEC remained silent, the court gave

CLC permission to sue 45Committee directly, which it did.  Id.  After that suit had commenced, however, the FEC voted to close the file in CLC's administrative complaint, revealing for the first time that the Commission had deadlocked on a reason-to-believe vote within the 30-day period specified under § 30109(a)(8)(C).  Id. at *2–4.  Based on the revelation of that information, and despite the fact that the FEC had voted to close the case file *after* the deadlocked reason-to-believe vote, the court held that the previous deadlocked vote had "conform[ed]" with its earlier order and that it therefore lacked jurisdiction under FECA.  Id. at *4.  In so holding, the court rejected CLC's argument that the failed reason-to-believe vote did not constitute "action" under FECA.  Id.  The court reasoned that the D.C. Circuit "has repeatedly acknowledged that Commission deadlocks, usually by a 3-3 vote, constitute 'deadlock dismissal[s],'" citing Common Cause, DCCC, and other cases for support.  Id. (alteration in original).

Respectfully, the Court disagrees with this analysis.  For one, as stated above, cases like Common Cause and DCCC repeatedly distinguished between deadlocked votes, on the one hand, and dismissals, on the other—a distinction that End Citizens United PAC recently reiterated. Additionally, the Court is not persuaded by CLC's reading of the D.C. Circuit's decision in Public Citizen, Inc. v. FERC, 839 F.3d 1165 (D.C. Cir. 2016).  The CLC court cited Public Citizen's observations that "FECA deadlocks as agency action . . . is baked into the very text of" FECA and that the FEC, accordingly, "engages in final agency action when, after receiving a complaint alleging certain types of campaign finance violations, it deadlocks."  CLC, 2023 WL 2825704, at *4 (quoting Public Citizen, 839 F.3d at 1170).  Although Public Citizen does, indeed, characterize "FECA deadlocks as agency action," Public Citizen was a case not about the FEC deadlock phenomenon but rather about similar deadlocks by FERC.  839 F.3d at 1169–72.

Accordingly, in its relatively brief discussion of FEC deadlocks, the Public Citizen court had no occasion to distinguish between the distinct phenomena of reason-to-believe votes, file closures, and dismissals or to analyze any overlap between those concepts.  Moreover, the court in Public Citizen did not express any awareness of the Commission's practice of declining to close the case file after a deadlocked reason-to-believe vote.  In that context, the Court reads Public Citizen's statements about deadlocks and its aside that FECA contains a "legal requirement to dismiss complaints in deadlock situations" to be a shorthand for the facts that (1) pursuing enforcement proceedings in FECA cases requires a four-vote majority, and (2) as a practical matter, a dismissal is virtually always the result, even if not the immediate result, of a deadlocked reason-to-believe vote.  Public Citizen, 839 F.3d at 1171.

More recently, the court in Heritage Action for America fully embraced the argument that deadlocked reason-to-believe votes are themselves dismissals, regardless of any separate vote to close the file.  2023 WL 4560875, at *7–9.  That case involved a now familiar set of facts.  CLC had filed a complaint with the Commission contending that Heritage Action had failed to disclose donor names.  Id. at *2.  The Commission took a reason-to-believe vote on the matter, which deadlocked 3-3, and then deadlocked on the subsequent vote to close the file.  Id. Consistent with recent agency practice, none of these votes were disclosed.  Id.  After 120 days of apparent inaction, CLC filed suit alleging that such neglect was contrary to law.  Id.  The district court agreed and remanded to the Commission, which again deadlocked on subsequent reason-to-believe and file-closure votes which were once more kept secret.  Id.  At that point, there were a flurry of lawsuits as CLC sued Heritage Action for alleged FECA violations and Heritage Action sued the Commission for its delay and non-disclosure of votes (which it had accessed through FOIA requests).  Id. at *3.  Both cases turned on the same question:  At what

24

point had the Commission dismissed the complaint and thus triggered its obligation to notify? The court in Heritage Action answered that the critical moment was the deadlocked reason-to-believe vote.  Id. at *7–9.  As a result, it found that the Commission had violated its obligation to disclose its deadlocked votes but dismissed CLC's petition as untimely because the organization failed to file its petition within 60 days of that undisclosed vote.  Id. at *10–11.

The Court again respectfully disagrees.  Heritage Action provided four reasons for why a deadlocked reason-to-believe vote constitutes dismissal, but none persuade the Court here.  First, it reasoned that, because the Commission cannot investigate without four votes, the necessary effect of deadlock must be dismissal because "any future reason-to-believe votes would be based on the exact same evidence already before the Commission for the first vote."  Id. at *8.  But experience has shown that the Commission routinely changes course after an initial failed reason-to-believe vote either because Commissioners are convinced by their colleagues or based on later negotiations to narrow the charges.  Second, although Heritage Action maintained that the D.C. Circuit long has treated deadlocked votes as final agency action, id., the cases that it cites for that proposition are the same opinions discussed above.  These cases may treat a deadlocked vote as leading to dismissal in some cases, but they do not hold that the two events are one and the same.  Third, Heritage Action contends the regulations equate a deadlocked reason-to-believe vote with the termination of proceedings when stating that if "the Commission finds no reason to believe, *or otherwise terminates its proceedings*, the General Counsel shall so advise both complainant and respondent by letter."  Id. at *9 (emphasis in original).  As the FEC explained in its briefing in that case, however, the Commission does not "find" that there is no reason to believe when it deadlocks, as any such finding would require the affirmative vote of four members.  Opp'n Mot. Summ. J., supra, at 29.  Fourth, Heritage Action reasoned that, "if a

deadlocked reason-to-believe vote does not constitute dismissal, some complaints could remain indefinitely in limbo before the Commission."  2023 WL 4560875, at *8.  The Court sympathizes with these policy concerns and acknowledges there are real costs associated with the Commission refusing to close a file when it is deadlocked indefinitely.  But that is the price of a deeply divided Commission, and it is not the judiciary's role to rectify the matter by changing the rules.

> 2.  *Is the 60-day limitations period subject to equitable tolling?*

Even if the Court were to agree with Heritage Action's determination that a deadlocked reason-to-believe vote counts as dismissal, that does not necessarily mean that CREW's petition here must be dismissed as untimely because it did not file a petition within 60 days of a vote that CREW did not know (and could not know) had taken place.  The Court acknowledges that the D.C. Circuit has referred to the 60-day limitations period as "jurisdictional and unalterable," see NRA v. FEC, 854 F.2d 1330, 1334 (D.C. Cir. 1988) (quoting Carter/Mondale Presidential Comm. v. FEC, 711 F.2d 279, 283 (D.C. Cir. 1983)), and that subsequent cases have repeated this jurisdictional label, see, e.g., Spannaus v. FEC, 990 F.2d 643, 644 (D.C. Cir. 1993); Jordan v. FEC, 68 F.3d 518, 518–19 (D.C. Cir. 1995).  Yet it is doubtful that these determinations are still in good standing because subsequent Supreme Court decisions appear to have "eviscerate[d] [their] reasoning."  Attias v. CareFirst, Inc., 344 F.R.D. 38, 46 (D.D.C. 2023) (citation and quotation marks omitted).  Time and time again, the Supreme Court has cautioned against the overuse of jurisdictional limits and routinely reversed courts for "misus[ing] the term 'jurisdictional' to refer to nonjurisdictional prescriptions."  Wilkins v. United States, 143 S. Ct. 870, 877 (2023) (citation and quotation marks omitted).  This is especially true in the context of filing deadlines, such as the 60-day limit here, as the Supreme Court has reiterated that such

deadlines are presumptively "nonjurisdictional claims-processing rules [which] simply instruct parties [to] take certain procedural steps at certain specified times without conditioning a court's authority to hear the case on compliance with those steps."  Robinson v. Dep't of Homeland Sec. Off. of Inspector Gen., 71 F.4th 51, 56 (D.C. Cir. 2023) (cleaned up).  To rebut this presumption, there must be a "clear statement" that Congress intended the time limit to be jurisdictional.  Id. Applying that stringent standard, the D.C. Circuit has reversed several of its prior "jurisdictional" determinations.  See, e.g., id. at 56–58.

There is ample reason to believe that it would do the same in this case.   The court in NRA did not analyze the FECA's text or comb through the Congressional Record to identify Congress's intent to make the 60-day window "jurisdictional and unalterable."  It simply quoted that line from an earlier decision dealing with a separate FECA limitations period, which had cut and pasted the slogan from a case involving a Federal Power Act filing deadline, which in turn had grabbed the quote from cases involving still other statutes.  See NRA, 854 F.2d at 1334 (quoting Carter/Mondale, 711 F.2d at 283 (quoting, in turn, Cities of Batavia v. FERC, 672 F.2d 64, 72–73 (D.C. Cir. 1982) (quoting other unrelated statutes))).  This citation chain sheds no light on what Congress intended when enacting the 60-day time limit at issue here.  Cases on the other end of the chain citing back to NRA fare no better, as they insist that "[s]tatutory time limits on judicial review are traditionally considered jurisdictional."  Jordan, 68 F.3d at 518; see also Spannaus, 990 F.2d at 644 ("Consistently, this court has declared mandatory, i.e., 'jurisdictional and unalterable,' statutes that fix the time for seeking judicial review." (citations omitted)). While that may have been traditionally true, times have changed.  It is now well-established that Congress "must do something special, beyond setting an exception-free deadline, to tag a statute of limitations as jurisdictional and so prohibit a court from tolling it," United States v. Wong,

575 U.S. 402, 410 (2015), and there is no evidence that the 60-day deadline to file a petition is anything other than an ordinary claims-processing rule.

If the 60-day window is non-jurisdictional and thus alterable, AAN's timeliness argument surely fails because this is a textbook example of where equitable tolling is necessary.  A party seeking equitable tolling must show "(1) that [it] has been pursuing [its] rights diligently, and (2) that some extraordinary circumstance stood in [its] way."  Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005).  CREW satisfies both requirements.  A quick skim through the procedural history in this case shows that CREW has been more than diligent in pursuing its rights, and the fact that the FEC kept its deadlocked reasoned to believe votes under wraps certainly qualifies as "circumstances that caused a litigant's delay [that] are both extraordinary and beyond its control."  Menominee Indian Tribe of Wis. v. United States, 577 U.S. 250, 257 (2016).

In short, there is ample "reason to believe" that CREW's petition would be subject to equitable tolling if need be.  The Court need not definitively decide that question now, however, because, for the reasons explained above, it finds that CREW's petition was timely filed after the Commission dismissed its complaint by voting to close the file.

*     *     *

Although it agrees with CREW that this case was timely filed, the Court also must raise two ambiguities that, because they were not briefed, it will not resolve at this time.

First, because nobody has briefed this question, the Court does not decide whether the Commission erred by failing to close the file and dismiss the case after its May 2018 vote.  The Commission's certification for its May 2018 vote states that it "[f]ailed by a vote of 3-1 to" close the file, with three Commissioners voting affirmatively and only Commissioner Weintraub dissenting.  May 2018 Certification, supra, at 3.  New Models, in particular, calls that result into

question when it held that the text of FECA "states that four members are necessary only 'to initiate,' 'defend,' 'or appeal any civil action,'" and thus "the affirmative vote of four members" is *not* needed for dismissals.  New Models, 993 F.3d at 891 (quoting 52 U.S.C. § 30107(a)(6)); see also 52 U.S.C. § 30106(c) (stating the general rule that the Commission must make decision by majority vote).  As mentioned earlier, however, this analysis conflicts with the D.C. Circuit's later decision in End Citizens United PAC relying on the Commission's Statement of Policy on Commission Action for the proposition that four votes are needed to dismiss a case.  69 F.4th at 921 (quoting 72 Fed. Reg. 12,545, 12,545–46 (Mar. 16, 2007)).  Given the opposing rulings, the Court will refrain from wading into these waters at this juncture to afford the parties an opportunity to brief this issue, should they choose.

Second, the Court does not address at this time whether Commissioner Weintraub's Statement of Reasons is itself untimely under End Citizens United PAC.  There, the day after the Commission failed to reach four affirmative votes on reason to believe, it voted unanimously to close the file "and dismissed" the administrative complaint.  Id. at 919.  Neither Chairman Dickerson nor Commissioner Cooksey, whose votes prevented a reason to believe finding, filed a statement of reasons explaining their votes, however.  Id.  Two months after the dismissal, End Citizens United PAC filed a complaint challenging the dismissal under § 30109(a)(8)(A), and four days after that, Chairman Dickerson and Commissioner Cooksey filed a statement of reasons, stating that they had voted not to find reason to believe pursuant to their prosecutorial discretion.  Id.  Relying on that invocation of prosecutorial discretion, the district court dismissed End Citizen United PAC's case.  Id.  On appeal, the Circuit reversed, explaining that "[a]s the controlling Commissioners," Chairman Dickerson and Commissioner Cooksey "were obligated to issue a contemporaneous statement 'explaining their votes,' which the court would treat as the

Commission's reason for the dismissal." Id. at 921.  That obligation, the court explained, means that "the controlling Commissioners' explanation" must be issued "at the time when a deadlock vote results in an order of dismissal."  Id. (quoting Common Cause, 892 F.2d at 449).  Because the Dickerson/Cooksey statement was not so issued, it could not be squared "with the prohibition on *post hoc* rationalizations."  Id. at 922.  But although the court concluded that the Dickerson/Cooksey statement was "non-contemporaneous," it did not explain just how "contemporaneous" a "contemporaneous" statement must be.  End Citizens United PAC stands at least for the conclusion that a statement issued after both "the commencement of the underlying litigation and the expiration of the statutory deadline to challenge the dismissal" is contrary to law and must be remanded.  Id. at 921, 923–94.  But the Court is not sure where that leaves statements, such as Commissioner Weintraub's here, that are issued weeks *after* the file-closure vote but *before* either the filing of a lawsuit or the expiration of the 60-day clock.

Because the parties have not briefed these questions, the Court leaves them for another day.  For now, the Court is satisfied that CREW's complaint was brought within the 60-day timeline prescribed by § 30109(a)(8)(B).

C.  Futility

In its motion to dismiss, the FEC contends that "remand would serve no purpose other than necessitating yet another round of administrative proceedings, but the outcome of agency consideration of enforcement is preordained"—in other words, that remand would be futile. FEC Mot. Dismiss at 11–12.  In particular, the FEC points to a non-controlling statement in this case issued by three Commissioners which, in the FEC's view, suggests that the Commission would not have four votes on remand to find reason to believe a violation occurred and,

presumably, would dismiss a remanded administrative complaint pursuant to the Commission's prosecutorial discretion.  Id. at 12–13.  The Court is not convinced by this argument.

For one, the statement cited in the FEC's brief does not speak one way or another about how the authoring Commissioners would decide the merits of a reason-to-believe vote on remand.  The FEC primarily points to a May 2022 statement by Chairman Allen J. Dickerson and Commissioners Sean J. Cooksey and James E. Trainor, III.  In re AAN, Statement of Reasons of Chairman Allen J. Dickerson and Commissioners Sean J. Cooksey and James E. "Trey" Trainor, III, MUR No. 6589R (May 13, 2022).[15]  This statement, however, expresses the Commissioners' views only as to the Commission's "failure to perform th[e] ministerial act" of closing the file in the AAN case after the 2018 reason-to-believe vote had failed.  Id. at 1.  The statement observes that the Commission took a file-closure vote on the AAN case "with an eye toward resolving stale matters and ensuring responsible use of agency resources," id. at 3, but the context suggests that the Commissioners viewed the matter as "stale" and a waste of "agency resources" only insofar as the Commission had already taken its substantive vote.  Indeed, the statement explains that the underlying reason-to-believe vote "predates our service on the Commission," and adds that, "as such," the authors "*take no position on the merits of that decision*."  Id. at 6 (emphasis added).  It is a bedrock principle of administrative law that "an agency's action must be upheld, if at all, on the basis articulated by the agency itself."  Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 50 (1983); see also SEC v. Chenery Corp., 332 U.S. 194, 196–97 (1947) ("It will not do for a court to be compelled to guess at the theory underlying the agency's action.").  It would be entirely speculative for the Court to guess from Chairman Dickerson's statement how the Commission might vote if this

---

[15]  Available at https://www.fec.gov/files/legal/murs/6589R/6589R_30.pdf.

case were remanded, let alone what its reasons for voting might be or whether those reasons would be subject to judicial review.

The D.C. Circuit, moreover, recently rejected virtually the same argument in End Citizens United PAC, the holding of which was discussed previously.  In addition to holding that the non-contemporaneous statement of reasons there was contrary to law, the Circuit also rejected the "fallback position that reversing the district court's judgment would be 'pointless' because Dickerson and Cooksey's prosecutorial discretion reason," expressed in the tardy statement of reasons, "would prevail on remand."  69 F.4th at 922.  Requiring an agency to provide "contemporaneous explanations for agency action," the court reasoned, "promotes 'agency accountability' by ensuring that parties and the public can respond fully and in a timely manner to an agency's exercise of authority" and advances "the orderly functioning of the process of review."  Id. at 922–23 (quoting Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 140 S. Ct. 1891, 1909 (2020)).  The court stressed, moreover, that the Supreme Court had "determined that remand was appropriate in Regents notwithstanding the agency's representation that there was 'no basis for concluding that [its] position might change'" and "that the matter would be considered by the 'same agency personnel' on remand."  Id. at 923 (citations omitted).  Thus, even if the May 2022 statement discussed above did speak to the Commission's view of the merits of the CREW complaint against AAN, which it did not, End Citizens United PAC and Regents would likely require remand here anyway.

The cases on which the FEC relies miss the mark.  For instance, Fogg v. Ashcroft, 254 F.3d 103 (D.C. Cir. 2001), held that remand would be futile where, although the agency had committed a legal error, "its ultimate conclusion" was "legally inevitable" under the correct legal analysis.  Id. at 111–12; see also NLRB v. Am. Geri-Care, Inc., 697 F.2d 56, 63–64 (2d Cir.

1982) (declining to remand because the outcome would be the same whether or not the agency had applied a possibly erroneous legal framework).  These cases, then, essentially stand for the unremarkable principle that if "the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration."  PDK Lab'ys Inc. v. DEA, 362 F.3d 786, 799 (D.C. Cir. 2004).  By contrast, the Court here cannot say that it is "legally inevitable" that the FEC on remand would invoke its prosecutorial discretion to decline to pursue enforcement proceedings, as such a determination is inherently tied up with time- and context-bound questions of when enforcement would "be an appropriate use" of agency "resources."  New Models, 993 F.3d at 882.  In a word, there is a difference between declining to remand because of a harmless legal error and declining to remand based on the potentiality that the FEC might invoke its prosecutorial discretion based on the facts and state of agency resources at the present moment.[16]

　　Also inapposite is FEC v. Legi-Tech, Inc., 75 F.3d 704 (D.C. Cir. 1996).  There, although the FEC had violated the Constitution by voting to pursue enforcement proceedings with two congressional officers sitting as *ex officio* members of the Commission, the D.C. Circuit nevertheless held that remand was not warranted because the Commission had cured any constitutional violation by reconstituting itself, excluding *ex officio* members, and taking a constitutionally proper vote to find probable cause that the Defendant had violated the law.  Id. at 706, 709.  Here, if the FEC's decision not to find reason to believe AAN violated FECA was contrary to law (a question not yet before the Court), there is no basis to conclude that the Commission has already cured that violation and that this Court's remand holds no prospect of

---

[16]  Lest there be doubt on this point, the Commission's rather unpredictable treatment of CREW's administrative complaint in this case gives the Court good reason not to hazard a guess as to how it may vote in the future.

relief for CREW.  See also Nat'l Parks Conservation Ass'n v. United States, 177 F. Supp. 3d 1, 35 n.10 (D.D.C. 2016) (explaining that, even if the court had found the Forest Service's action arbitrary and capricious, it "harbor[ed] doubts" that it could provide the plaintiff relief, as remand to the agency to produce an environmental impact statement after the passage of six years "would be near impossible to square" with the requirement that the agency act expeditiously).

Accordingly, the Court will not dismiss CREW's complaint on the grounds that remand would be futile.

### D.  Prosecutorial Discretion

Finally, the Court turns once again to the impact of New Models on this litigation, namely whether the Commission's brief reference to prosecutorial discretion in its very first Statement of Reasons in this case—way back in 2014—bars the Court's review of Commissioner Weintraub's statement here.

As a refresher, after the FEC failed to conform to this Court's second remand following CREW II, CREW filed a suit directly against AAN.  CREW III, 410 F. Supp. 3d at 11.  The Court initially denied AAN's motion to dismiss, but it granted reconsideration and ultimately dismissed the case in light of New Models.  CREW IV, 590 F. Supp. 3d at 165–66, 173–75.  As in New Models, the Court explained, the Commission's "fleeting, conclusory reference to prosecutorial discretion" in its 2014 Statement of Reasons was "fatal to CREW's claim."  Id. at 173–74.  In a footnote, the Court acknowledged that, unlike the 2014 Statement of Reasons, the 2016 Statement of Reasons then on review "did not mention prosecutorial discretion at all."  Id. at 174 n.7.  But the Court then observed that "if the passing reference to prosecutorial discretion in the initial statement made the first dismissal unreviewable under New Models, then the Court

lacked the power to issue the remand order that resulted in the second statement." Id. "The result would have been a dismissal of CREW's case, and the Commissioners never would have issued a second statement." Id. "In any event," the Court added, the 2016 Statement of Reasons "incorporate[d] by reference" the first one, which was sufficient to conclude that CREW's citizen suit must be dismissed under New Models. Id. (citation omitted).

Returning to the present case, it is clear that Commissioner Weintraub read the Court's last opinion carefully. Because her lone abstention from the 2018 reason-to-believe vote caused the Commission to "fail[] to muster four votes in favor of initiating an enforcement proceeding," her explanation for that abstention is entitled to controlling weight for purposes of this petition for review. CHGO, 892 F.3d at 437.[17] Apparently seeking to evade any roadblocks to a remand set by New Models or CREW IV, Commissioner Weintraub disclaims both any reliance on prosecutorial discretion and any incorporation of the reasoning of the FEC's prior statements.

---

[17]  The FEC concedes that Commissioner Weintraub's statement is controlling, although it notes that it "is unaware of any previous case in which a single abstaining Commissioner caused the FEC to lack the required four votes to find reason to believe." FEC Mot. Dismiss at 9 n.4. Stressing that the statement does not even purport to justify her vote as it is singularly aimed at condemning the Commission's failure to proceed as contrary to law, AAN vigorously contests the conclusion that Commissioner Weintraub's statement is controlling. AAN Mot. Dismiss at 25–28. The Court sympathizes with AAN's confusion on this count. But, although Commissioner Weintraub's statement is no doubt unorthodox, the Court can find no basis to depart from the D.C. Circuit's repeated holdings that the "statement of reasons by the declining-to-go-ahead Commissioner[]," in this case Commissioner Weintraub, speaks for the Commission. Common Cause, 842 F.2d at 449; see also CHGO, 892 F.3d at 437–38 (explaining that "for purposes of judicial review, the statement or statements of those naysayers—the so-called 'controlling Commissioners'—will be treated as if they were expressing the Commission's rationale for dismissal, a rather apparent fiction raising problems of its own"); Nat'l Republican Senatorial Comm., 966 F.2d at 1476 ("Since those Commissioners constitute a controlling group for purposes of the decision, their rationale necessarily states the agency's reasons for acting as it did."). Moreover, if Commissioner Weintraub's statement is, indeed, the "equivalent of a boxer taking a dive," as AAN contends, AAN Mot. Dismiss at 27, the Court does not see why that fact would require dismissal of CREW's complaint, as opposed to remand to the Commission for a new statement.

Third Statement of Reasons at 8–9.  Accordingly, Commissioner Weintraub's statement maintains that this Court has the authority to review her statement and must remand this case to the FEC because her statement is contrary to law.  Id. at 11.

Notwithstanding Commissioner Weintraub's abandonment of any reliance on prosecutorial discretion, AAN maintains that CREW's suit must be dismissed because, had the Court decided the first two petitions in accordance with New Models, the case would have been dismissed, and Commissioner Weintraub never would have been in a position to issue the present statement.  AAN Mot. Dismiss at 24–25.  In response, CREW maintains that the Court "did not rely" on this hypothetical, alternative-timeline reasoning but instead dismissed CREW's last suit based on the Second Statement of Reasons' incorporation of the first.  Opp'n at 28–29.

The Court will save this vexing question for another day.  As the parties in this case are well aware, CREW has filed an appeal of this Court's decision in CREW IV to dismiss its complaint under New Models.  Both CREW's and AAN's briefs in that appeal directly address the Court's hypothetical reasoning from CREW IV.  CREW maintains that any consideration of the counter-factual world where New Models prevented the birth of the FEC's Second Statement of Reasons would improperly revive a dead letter agency decision, Public Brief for Plaintiff-Appellant at 29–31, CREW v. AAN, No. 22-7038 (D.C. Cir. Mar. 29, 2023), Doc. No. 1992359, whereas AAN maintains that "the first statement cuts off all further review" whether subsequent statements incorporated it or not, Brief for Appellee at 31–32, CREW v. AAN, No. 22-7038 (D.C. Cir. June 30, 2023), Doc. No. 2006015.  Thus, although the Circuit may not need to reach this question, it is reasonably possible that it will provide instruction that could govern the Court's treatment of the FEC's past statements of reasons in this case.  Rather than leapfrog the Circuit's potential decision on this uncertain question, the Court believes it more prudent to deny

AAN's motion to dismiss on this ground, without prejudice to renewal after a decision is rendered in CREW's pending appeal.[18]  In the meantime, to avoid the expenditure of unnecessary resources, the Court will stay this case.

**IV.  Conclusion**

For these reasons, it is hereby

**ORDERED** that [Dkt. No. 12] Defendant Federal Election Commission's Motion to Dismiss is DENIED without prejudice to renewal.  It is further

**ORDERED** that [Dkt. No. 15] Intervenor American Action Network's Motion to Dismiss is DENIED without prejudice to renewal.  It is further

**ORDERED** that this case is stayed pending the decision of the D.C. Circuit in CREW v. American Action Network, No. 22-7038.

**SO ORDERED**.

 

 

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: September 20, 2023

---

[18]  The Court does, however, reject CREW's extended argument that the Court must disregard New Models and CHGO as in conflict with prior binding precedent.  Although CREW is correct that, "when a decision of one panel is inconsistent with the decision of a prior panel, the norm is that the later decision, being in violation of that fixed law, cannot prevail."  Sierra Club v. Jackson, 648 F.3d 848, 854 (D.C. Cir. 2011).  But the prior cases which CREW maintains conflict with CHGO and New Models—Akins, DCCC, Chamber of Commerce of U.S. v. FEC, 69 F.3d 600 (D.C. Cir. 1995), and Orloski v. FEC, 795 F.2d 156 (D.C. Cir. 1986)—were all considered by New Models, and the court either "harmonize[d]" them or concluded that they "conform[]" with its reasoning.  993 F.3d at 893–95.  That New Models is consistent with those prior cases, then, is the law of the Circuit and binding on this Court.